## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. CR-19-71 |
| EDUARDO VILLA-ALVAREZ, | ) ) ) | |
| Defendant. | ) | |

### DEFENDANT EDUARDO VILLA-ALVAREZ'S SENTENCING MEMORANDUM

Pursuant to Tit. 18 U.S.C. § 3553(a) and United States v. Booker, 543 U.S. 220, 25 S.Ct. 738, 160 L. Ed. 621 (2005), Defendant Eduardo Villa-Alvarez (hereinafter referred to as Mr. Alvarez), by and through his attorney of record, Cesar A. Armenta, submits this sentencing memorandum to assist the Court in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives of Tit. 18 U.S.C. § 3553(a).

The Presentence Investigation Report submitted in this matter (the "PSR") calculates Mr. Alvarez's guideline range at 262 to 327 months based on a total offense level of 39 and a criminal history category I. PSR, ¶95. Counsel contends a two (2) point downward adjustment is warranted under § 3B1.2(b), therefore Mr. Alvarez's guideline range should be 210 to 262 months based on a total offense level of 37 and a criminal history category I. For the reasons discussed herein, Mr. Alvarez suggests that a sentence

of seventy-two (72) months' incarceration with three (3) years' supervised release is appropriate under the circumstances and satisfies the statutory objectives of § 3553(a).

## I. STATUTORY SENTENCING ISSUES

### A. The History and Characteristics of Mr. Alvarez and Circumstances of the Offense: Tit. 18 U.S.C. § 3553(a)(1).

The PSR provides an adequate personal background for Mr. Alvarez but falls short in explaining the circumstances behind his involvement in the conspiracy charged in this matter. Mr. Alvarez was born in Michoacan, Mexico, and unlike so many individuals counsel has previously represented, had a wonderful upbringing. Mr. Alvarez was raised in a humble and caring home. Although his Mr. Alvarez's parents divorced when he was young, he was able to consistently interact with both parents due each respective parent remaining in the family's hometown.

The separation of Mr. Alvarez parents caused a financial strain on the family. Although Mr. Alvarez was able to continue his interaction with this father, financial support from his father was non-existent. Mr. Alvarez never liked school as a child, but realized pursuing an education would be the only way to succeed in life. Unfortunately, upon completing the sixth-grade, Mr. Alvarez had to quit school and get a job to assist with the family expenses. At age twelve (12) Mr. Alvarez was forced to work in the fields rather than continue his schooling. The working conditions for such a labor-intensive job are arduous to say the least, but for a young child it was so much worse. Regardless of the trials and tribulations Mr. Alvarez had to overcome on a daily basis, his family remained firm in forcing work over school for Mr. Alvarez.

Mr. Alvarez was earning a minimal amount for such harsh conditions. Unfortunately, employment opportunities were limited for a twelve (12) year old who had no choice but to work in order to survive. Mr. Alvarez's lack of education limited his employment opportunities; therefore, he continued performing field work for years. As time progressed Mr. Alvarez found work as a foreman for a trimming company earning $78.00 dollars per week. In addition to working full time as a tree trimmer, Mr. Alvarez worked a second job cutting and selling grape fruits to warehouses earning $78.00 dollars daily, but was limited to working three (3) days per week.

Mr. Alvarez came to the realization that with a growing family he needed to supplement his income. It was incumbent that Mr. Alvarez immigrate to the United States in order to financially support his wife and daughters. Mr. Alvarez's decision to immigrate was not predicated on nefarious activities, but rather seeking lawful employment that would give him an opportunity to earn in one (1) day what he was earning in a week working two (2) jobs. Mr. Alvarez chose to immigrate to Oklahoma, because he had acquaintances from his hometown in Michoacan that were residing here. Shortly upon Mr. Alvarez's arrival to Oklahoma he became entangled with the wrong people, which has resulted in Mr. Alvarez's incarceration for the aforementioned charges.

While seeking lawful employment, Mr. Alvarez was approached by individuals offering him an opportunity to reside at a stash house where drugs were kept earning $1,000 dollars per week. Mr. Alvarez would randomly be given instructions by unknown individuals and he was expected to comply with those instructions. In hindsight, Mr. Alvarez knows he should not have acquiesced to their offer, but at the time earning that

amount of money was an opportunity Mr. Alvarez could not decline. During his brief employment, Mr. Alvarez was able to send money not only to his wife and children, but his mother as well, as accurately stated in the Pre-Sentence Report (PSR). He could not refuse.

Mr. Alvarez, as evidenced in the PSR, has been consistently gainfully employed, often working long hours to assist his family with the financial burdens of daily life. Mr. Alvarez made an enormous misstep in allowing himself to become involved in the instant offense, but this choice is not reflective of the true nature of Mr. Alvarez – it is not "who he is." Mr. Alvarez is a twenty-three (23) year old individual with no previous criminal history. A person who knows the true meaning of hard work, dedication, and the importance of being a role model for his daughters. Mr. Alvarez was not an individual who provided guidance on the logistics of pick-ups and deliveries of drugs. Those instructions were conveyed to Mr. Alvarez, and he was expected to comply with them.

The Court is well aware that Drug Trafficking Organizations (DTOs) commonly operate as an organizational hierarchy. There are individuals who have substantial amount of authority, power, and influence within any given DTO. As a result, you have individuals such as Mr. Alvarez who are lured by empty promises to have easy access to drugs, and to make exponentially large sums of money, without ever achieving their desired goal. These individuals, often in positions of authority within the DTO, prey on the needs and misfortunes of others, while simultaneously placing them in no win situations due to the fact they face ALL of the exposure if and when they are arrested. These individuals have

extensive experience in supplying drugs, picking up money, and ensuring all parameters are set in place distancing themselves from anyone, such as Mr. Alvarez, when arrested.

Mr. Alvarez had no aspirations of involving himself in any criminal activity upon his arrival to Oklahoma six (6) prior to his arrest. Mr. Alvarez came to lawfully work and provide for his family. That is corroborated by the fact that he has no previous criminal law enforcement contacts. It is evident Mr. Alvarez's involvement in the instant offense is predicated on the fact that he wanted to provide for his family, and was presented not only presented with a weekly amount of money that he only dreamed of while working the fields in Mexico, but also a free place to live in. It was an offer to good to be true, but Mr. Alvarez failed to take into consideration the very real consequences he now faces.

Although Mr. Alvarez is fully aware of the possible consequences brought on by his personal choices, he wants the Court to punish him for his conduct alone. Mr. Alvarez's involvement in the instant crime is an aberration, and he wishes he would have had the common sense to not have accepted anyone's offer. Unfortunately, Mr. Alvarez failed to seek other lawful avenues to increase his earning potential, and as a result, has lost his freedom and ability to be with his family.

While the road Mr. Alvarez chose was obviously the legally and morally wrong path to follow, his intentions were not predicated in selfish greed. Mr. Alvarez knowingly and voluntarily involved himself in this crime. Mr. Alvarez has no prior criminal history, juvenile, or adult, and no violence or threats of violence are alleged to have taken place. As such, despite this participation in the instant offense, Mr. Alvarez appears to present

little to no risk to anyone. He wants to move forward with his life by continuing to strive for better. He will continue to work hard, and be a role model for his siblings, mother, wife and children.

> **B. The Need for the Sentence Imposed to Promote Certain Statutory Objectives: Tit. 18 U.S.C. § 3553(a)(2)**
>
> **1. A seventy-two (72) month sentence would reflect the seriousness of the offense and provide just punishment for the offense: (a)(2)(A).**

Although a seventy-two (72) month sentence would be a significant downward variance from the guideline range calculated in the PSR, it represents a significant and just punishment under the circumstances.

### a. Age and Circumstances

Tit. 18 USC §3553(a)(1) requires full consideration of age as a mitigating factor in sentencing. As stated above, Mr. Alvarez was only nineteen (22) years old when he engaged in the conduct in this matter. Current research on brain development demonstrates that the region of the brain governing judgment, reasoning, impulse control, and the ability to accurately assess risks and foresee consequences is not fully formed until the early to mid-twenties. See Jay N. Giedd, Structural Magnetic Resonance Imaging of the Adolescent Brain, 1021 Annals N.Y. Acad. Science, pp. 105-109 (June 2004); United States Department of Justice, Office of Juvenile and Delinquency Prevention, Annual Report, p. 8 (2005) (available at www.ncjrs.gov/pdffiles1/ojjdp/212757.pdf) (confirming that adolescents "often use the motional part of the brain rather than the frontal lobe, to make

decisions" and "[t]he parts of the brain that govern impulse, judgment, and other characteristics may not reach complete maturity until an individual reach age 21 or 22").

A sentence of seventy-two (72) months of incarceration seems more than sufficient punishment when one considers the age and extenuating circumstances that brought Mr. Alvarez into the drug trade. Mr. Alvarez did not seek to be employed by the DTO. Mr. Alvarez was not a shot caller or leader within this drug trafficking organization. Mr. Alvarez was paid to stay at the stash house, and was expected to comply with any and all directives from unknown individuals. As previously articulated, the purpose of maintaining a significant distance from those who stay at stash houses is to ensure the exposure and consequences are faced only by them, as they are very likely to be arrested, charged, and incarcerated due to being present at a residence where all the drugs are located. For those in authoritative positions within any given DTO, the moment a property is raided by law enforcement their lack of proximity to the place raided ensures they are not apprehended. Furthermore, those individuals immediately relocate, change phone numbers, and are not concerned about dissemination of any names or biographical information because those at the low end of the hierarchy are not privy to such information.

Mr. Alvarez being only twenty-three (23) years old makes a six (6) year sentence of incarceration very significant. This holds even more true in light of this being Mr. Alvarez's first sentence of incarceration in his life. Even taking age out of the equation, a sentence anywhere near the guideline range calculated in the PSR would be excessively harsh for someone with no prior adult convictions.

### b. Significant Punishment Prior to Sentencing

The six (6) year sentence sought herein is also significant when one considers the punishment Mr. Alvarez will have already received prior to sentencing. Mr. Alvarez was placed in the custody of the United States Marshal's on March 8, 2019. By the time Mr. Alvarez is sentenced on February 10, 2020, he will have spent eleven (11) months total in the Logan County Jail. Although he will most likely get day-for-day credit for this time served, it already serves as a significant punishment. Time spent in county jails awaiting trial or sentencing is widely considered much harder time than that spent in a BOP Facility. This is, in part, because county jails like Logan County do not have the resources for inmates to engage programs or treatment or even to simply go outside. The eleven (11) months in Logan County Jail is also significant when one considers Mr. Alvarez's age, as he was incarcerated with many individuals that are much older, hardened criminals. Lastly, Mr. Alvarez is undocumented and will be immediately deported upon his completion of any Bureau of Prisons sentenced issued by this Court.

2. **A seventy-two (72) month sentence will deter any future criminal conduct by Mr. Alvarez and protect the public from further crimes by Mr. Santiago: (a)(2)(B) and (a)(2)(C)**

The seventy-two (72) month sentence respectfully requested herein is a significant sentence that would adequately deter Mr. Alvarez from future crimes. The Supreme Court has acknowledged that the young are less culpable than the average offender and have a high likelihood of reforming in a short period of time. *Roper v. Simmons*, 543 U.S.C 551, 567, 569- 70 (2005). According to the United States Sentencing Commission, drug

offenders generally have lower rates of recidivism. USSC, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, p. 13 (2004).

Incarcerating Mr. Alvarez anywhere near the guideline range calculated in the PSR would not deter him from committing crimes in the future any more than a seventy-two (72) month sentence would. Studies have found that the evidence on the deterrent value of imprisonment generally is ambiguous at best, and not a sound basis upon which to sentence. See Paul J. Hofer & Mark H. Allenbaugh, The Reason Behind the Rules: Finding and using the Philosophy of the Federal Sentencing Guidelines, 40 Am. Crim. L. Rev. 19, 61-62 (2003). In fact, a lengthier sentence for Mr. Alvarez would be more likely to have the opposite effect. BOP research also shows that overly lengthy sentences for low-risk drug offenders can actually increase recidivism. See Miles D. Harar, Do Guideline Sentences for Low Risk Drug Traffickers Achieve Their Stated Purposes?, 7 Fed. Sent. Rep. 22 (1994). Similarly, studies have shown that exposing young offenders to "more experienced inmates … can influence their lifestyle and help solidify their criminal identities." Lynn M. Vieraitis, Tomaslav V. Kovandzic, Thomas B. Marvel, The Criminogenic Effects of Imprisonment: Evidence from the State Panel Data 1974-2002, 6 Criminology & Public Policy 593, Note 195 (2007).

There is also no evidence that lengthy prison sentences deter others. See Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Justice: A review of Research 28-29 (2006); Ilyana Kuziemko & Steven D. Levitt, An Empirical Analysis of Imprisoning Drug Offenders, 88 J. of Pub. Econ. 2043 (2004) ("it is unlikely that the dramatic increase in drug imprisonment was costeffective"). Drug crimes are generally driven by user

demand, and incarcerating low-end traffickers does not slow down drug crime, as such traffickers are quickly replaced. See USSC, Cocaine and Federal Sentencing Policy, p. 68 (1995) (citing DEA and FBI reports that noted drug dealers were immediately replaced). To this point, the supply and consumption of methamphetamine have steadily increased since 2000 despite increased penalties. See What America's Users Spend on Illegal Drugs, Office of National Drug Control Policy, Figure FW 8 (2012). It should also be noted that the three years of supervised release requested herein serves as another mechanism to protect the public from any future offenses by Mr. Alvarez.

In light of the fact that the additional incarceration provides no additional benefit to society, it follows that it is pointless to have the American taxpayer pay for the additional sixteen (16) years that represents the difference between the sentence requested herein and the bottom of the guideline range calculated in the PSR. According to the PSR, the additional cost to the taxpayer for this additional incarceration would be $599,168 ($37,448 x 16). See PSR, ¶106.

### C. The Need to Rehabilitate Mr. Alvarez in the Most Effective Manner: Tit. 18 USC 3553(a)(2)(d)

Mr. Alvarez has substance abuse issues that need to be addressed. He can address these issues while incarcerated through the RDAP and other programs. A six (6) year sentence would enable Mr. Alvarez to enter the RDAP program if eligible, and counsel is unaware of any drug program that would not be available to him with such a sentence. As discussed above, however, excessive incarceration (as in, anywhere near the guideline

range calculated in the PSR) in this matter would be harmful for Mr. Alvarez's rehabilitation and ultimate reintegration into society.

>	D.	The Need to Avoid Unwanted Disparities and Unwarranted Similarities- Tit. 18 U.S.C. §3553(a)(6)

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. Tit. 18 U.S.C. 3553(a)(6). The Court should also avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range. *Gall v. United States*, 552 U.S. 38, 55 (2007). As discussed above, Mr. Alvarez was a stash house operator for months prior to his arrest, as part and parcel to such role, complied with orders given to him by others within the DTO. He was one of the youngest members of the conspiracy, if not the youngest. Mr. Alvarez was not a source of supply and did not have discretion in his role and primarily took orders from others as to what needed to be done at the stash house, and he has not received a leadership role enhancement under the guidelines in this matter.

A six (6) year sentence would establish a precedent in relation to this case and the remaining two (2) co-defendants. Counsel is unaware of the roles, status, or leadership positions the other co-defendants may have held within this DTO. Counsel can only attest to Mr. Alvarez's unique and ominous position as he awaits his sentence. Mr. Alvarez would articulate that a sentence of seventy-two (72) months is sufficient but not greater than necessary to accomplish the sentencing objectives of 3553. Furthermore, such a

sentence would be adequate due to Mr. Alvarez's age, lack of criminal history, and limited role and time within this drug trafficking organization.

**III. The Guideline Calculation Does Not Provide a Reliable Suggested Sentence.**

USSG §2D1.1 (pursuant to USSG §2D1.8) yields an offense level of 38 for Mr. Alvarez: only five (5) levels below the maximum offense level of 43 and a corresponding guideline range of life. This generally seems unreliable and excessive, but especially when one compares Mr. Alvarez's conduct in this matter to the base offense level for more serious, violent crimes such as the following:

- Sex trafficking of children by force, USSG § 2G1.3(a)(4) (Base Offense Level 34);

- Criminal sexual abuse of a minor under the age of sixteen years, USSG § 2A3.2(a) (Base Offense Level 18)

- Bombing an airport or mass transit facility, USSG § 2K1.4(A)(1) (Base Offense Level 24);

- Robbery with a dangerous weapon causing serious bodily injury, USSG § 2B3.1(a), (b) (Base Offense Level 20-31);

- Inciting a prison riot with substantial risk of death, USSG § 2P1.3 (Base Offense Level 22);

- Assault with intent to commit murder, USSG § 2A2.1(a)(2) (Base Offense Level 27)

- Voluntary manslaughter, USSG § 2A1.3 (Base Offense Level 29)

- Involuntary manslaughter, USSG § 2A1.4(a)(2)(A) (Base Offense Level 22); and

- Conspiracy or solicitation to commit murder, USSG § 2A1.5(a) (Base Offense Level 33).

As the Court can see, not only are these above-listed offense levels just lower than Mr. Alvarez's in this matter, they are substantially lower. In fact, a majority of the above-

listed offense levels are more than ten (10) levels lower than Alvarez's offense level in this matter.

Second, Mr. Alvarez's bloated offense level has been enhanced by factors that were not designed to sentence an individual charged in the underlying drug offense to determine an offense level. As a result, Alvarez's base offense level starts at 38. PSR, ¶44. Further showing the unreliability of the guidelines under the circumstances, Mr. Alvarez received a two (2) level increase for, essentially, maintaining a stash house. See PSR, ¶46. This is clearly a redundant enhancement that double punishes Mr. Alvarez for the same conduct. USSG §2D1.1 also added two (2) offense levels for possession of a firearm in connection with the drug-trafficking activity. PSR, ¶45. Although this generally is a seemingly rational enhancement, it is of no assistance under the circumstances of this case. There is no evidence of Mr. Alvarez ever using the gun during the drug transactions referenced in the PSR1 (Mr. Santiago does no object to the application of this enhancement, but asserts this argument solely for mitigation purposes).

## **CONCLUSION**

Mr. Alvarez's punishment must be "sufficient, but not greater than necessary," to fulfill the stated objectives of punishment. Under the circumstances of this case, the defense asks the Court to consider a term of imprisonment of seventy-two (72) months, a term of imprisonment well below the advisory guideline range, which is sufficient to accomplish the objectives of punishment and is based upon the myriad of factors that this Court takes into consideration.

Respectfully submitted,

s/ Cesar A. Armenta_____
Cesar A. Armenta, OBA #21588
228 Robert S. Kerr, Ste. 715
Oklahoma City, OK 73102
Phone: (405) 863-4643
Fax: (405) 228-2525
E-mail: armenta.cesar@yahoo.com
COUNSEL FOR DEFENDANT

**Certificate of Electronic Filing and Service**

This is to certify that on this 23rd day of January, 2020, I caused the foregoing instrument to be filed with the Clerk of the Court using the Clerk of the Court using the ECF System for filing. A copy will be served electronically to Matthew P. Anderson, AUSA, 210 W. Park Avenue, Ste. 400, Oklahoma City, OK 73102. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ Cesar A. Armenta